Megan Peitzke, Esq. (Bar No. 230375)
COZEN O'CONNOR
601 S. Figueroa Street, Suite 3700
Los Angeles, CA  90017
Telephone: 213-892-7900
Facsimile:  213-892-7999

Attorneys for Plaintiff
FARMERS INSURANCE EXCHANGE

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FARMERS INSURANCE EXCHANGE, a California Interinsurance Exchange, as subrogee of Steven Wolski, <br><br> Plaintiff, <br><br> v. <br><br> GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI <br> Jinji Road West <br> Qianshan Zhuhai Guang Dong, 51907 <br> China <br><br> and <br><br> HONG KONG GREE ELECTRIC APPLIANCE SALES, LTD. <br> Unit 2612 Miramar Tower <br> 132 Nathan Road <br> Tsin Sha Tsui Kowloon, Hong Kong <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR:** <br><br> **JURY TRIAL DEMANDED** |

## **THE PARTIES**

1.     Plaintiff, FARMERS INSURANCE EXCHANGE, is a California

interinsurance exchange, its subsidiaries, affiliates, and/or parent companies, duly

57262756\2 0124301/00496874

Confidential

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

organized and existing under and by virtue of the laws of the State of California, and authorized to do business in the State of California and Michigan, as an insurer.

2.      Defendant, Gree Electric Appliances, Inc. of Zhuhai ("Gree China") is a Chinese corporation with its principal place of business located at Jinji Road West, Qianshan Zhuhai Guang Dong, 51907 China.

3.      Defendant, Hong Kong Gree Electric Appliances Sales, Ltd. ("Gree Hong Kong"), is a Chinese corporation with its principal place of business located at Unit 2612 Miramar Tower, 132 Nathan Road, Tsin Sha Tsui Kowloon, Hong Kong.

## PERSONAL JURISDICTION

4.      This case arises out of the sale and distribution of two million, five hundred thousand (2,500,000) dehumidifiers that were designed and manufactured by Gree China and exported into the United States by Gree Hong Kong, China's wholly owned subsidiary.

5.      The Gree China manufactured dehumidifiers were exported by Gree China and Gree Hong Kong and sold to two California based corporations, known as to MJC American, LTD ("MJC") and Gree USA, Inc. ("Gree USA").

6.      MJC and Gree USA are two California corporations owned and controlled by defendants Gree China and Gree Hong Kong.

7.      Despite its substantial sales of products worldwide, Gree China had relatively small sales in the United States before 2010.

8.      As part of its plan to penetrate the US consumer market, Gree China needed a brand name that major US retailers were familiar and comfortable with, so that these retailers would purchase products manufactured by Gree China.

9.      Starting in 2008/2009, Gree China, for the purpose of increasing sales in the United States and for the purpose of associating itself with a brand familiar to US retailers, approached MJC in California about MJC selling and promoting Gree China products to US retailers, including Home Depot, Sears, Lowe's and other similar retail chains.

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

2

COMPLAINT; JURY TRIAL DEMANDED

Confidential

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

10.     Starting in 2010, Gree China and MJC agreed to brand dehumidifiers under the name "SoleusAir powered by Gree" as a test case to determine if MJC's Soleus brand could assist Gree China in penetrating the US market.

11.     From January of 2010 until October of 2010, Gree China exported at least 421,000 dehumidifiers bearing the "SoleusAir powered by Gree" brand to MJC in California for distribution to US retailers, including retailers in Michigan.

12.     In September of 2010, Madam Dong, the President and CEO of Gree China and Gree Hong Kong, along with other employees of Gree China and Gree Hong Kong, traveled to California for the purposes of meeting with MJC's officers and to tour US retailers.

13.     As a result of the September 2010 meeting in California, Gree China and Gree Hong Kong entered into a memorandum of understanding concerning the formation of a joint venture between Gree Hong Kong and MJC, whereby Gree Hong Kong would own 51% and MJC would own 49% of a company to be called Gree USA which would market, sell, and distribute products made by Gree China in the United States.

14.     In 2011, Gree China manufactured 274,691 dehumidifiers that it sold via Gree Hong Kong to MJC and Gree USA, which MJC and Gree USA distributed to retailers throughout the United States, including Michigan.

15.     In 2012, Gree China manufactured 845,513 dehumidifiers that it sold via Gree Hong Kong to MJC and Gree USA, which MJC and Gree USA distributed to retailers throughout the United States, including Michigan.

16.     In 2013, Gree China manufactured 285,596 dehumidifiers that it sold via Gree Hong Kong to MJC and Gree USA, which MJC and Gree USA distributed to retailers throughout the United States, including Michigan.

17.     In total, from 2010 through 2013, Gree China manufactured and sold 1,840,000 dehumidifiers via Gree Hong Kong to MJC and Gree USA, two

Confidential

California corporations, which MJC and Gree USA distributed to retailers throughout the United States, including Michigan.

## SUBJECT MATTER JURISDICTION AND VENUE

18.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) as plaintiff is a citizen of a different state than all named defendants who are foreign corporations and the amount in controversy, is in excess of $75,000.00, exclusive of interest.

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 as the events giving rise to plaintiffs' claims occurred in this judicial district.

## THE FIRE

20.     At all times material hereto, Steven Wolski was the owner and resident of a house located at 44251 Merrill Road, Sterling Heights, Michigan.

21.     Before October 12, 2020, Mr. Wolski has purchased a Gree China manufactured dehumidifier that had been exported to the Gree USA and/or MJC for distribution throughout the United States.

22.     The dehumidifier in the Wolski residence (hereinafter the "Wolski dehumidifier") had been manufactured and distributed by the defendants.

23.     On October 20, 2020, the Wolski dehumidifier failed, causing a fire.

24.     The fire caused smoke, flame and water damage to the real and personal property of  Mr. Wolski as well as loss of use of said property.

## GREE CHINA'S AND GREE HONG KONG'S FALSIFICATION OF UL CERTIFICATION

25.     Gree China and Gree Hong Kong represented to MJC, Gree USA, retailers and the general public that its dehumidifiers were certified by Underwriter's Laboratory ("UL") and that the design and materials used in the manufacturing of its dehumidifiers complied with UL Standard 474 and Standard 94.

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

4

Confidential

26.     As part of the UL certification process, Gree China and Gree Hong Kong made representations to UL that the plastics used in the construction of its dehumidifiers complied with the fire ratings in UL 94.

27.     UL 94 requires that consumer electric products, including dehumidifiers, use plastics that have specific burn and flame rates in order to prevent, reduce and limit the risk of fire hazards.

28.     In its application for UL certification under UL 474, Gree China represented that the materials and plastics used to manufacture and construct its dehumidifiers were compliant with UL 94.

29.     Gree China and Gree Hong Kong made these false and misleading representations knowing that the materials and plastics used to manufacture and construct its dehumidifiers were not compliant with UL 94's burn and flame rate requirements.

30.     Gree China and Gree Hong Kong made these false and misleading representations knowing that UL was unable to independently conduct the burn/flame resistance testing set forth in UL 94, and that UL relied on Gree China's representations in the certification documents stating that Gree China had these tests performed and the dehumidifiers complied with UL 94.

31.     US retailers will not purchase and sell dehumidifiers that are not certified by UL.

32.     US consumers will not and cannot purchase dehumidifiers that are not certified by UL because US retailers will not purchase or sell non-UL listed electric products.

33.     Gree China's and Gree Hong Kong's falsification of the UL Certification process was done for the purposes of misleading UL into improperly certifying the dehumidifiers and, in so doing, Gree China and Gree Hong Kong defrauded and misled US retailers and consumers into purchasing its dehumidifiers

COMPLAINT; JURY TRIAL DEMANDED

Confidential

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

on the false belief that the dehumidifiers were designed and manufactured in compliance with UL standards.

## GREE CHINA'S KNOWING SALE OF DEHUMIDIFIERS AFTER IT HAD ACTUAL KNOWLEDGE THAT ITS DEHUMIDIFIERS WERE DEFECTIVELY DESIGNED AND MANUFACTURED

34. From 2008 until the present time, Gree China was an original equipment manufacturer for General Electric branded dehumidifiers.

35. In late 2010, GE instructed Gree China to make certain design changes and product improvements to GE branded, Gree China manufactured dehumidifiers.

36. The design changes were mandated by GE due to product failure issues with the dehumidifiers, including overheating issues and fires.

37. The GE mandated design changes required a) the removal of electrical terminal sleeves that used PVC materials; b) the use of UL 94 V0 rated plastics for structural components of the dehumidifiers, including the fan shroud base, center support and external cabinet; and c) the use of UL 94 flammability rated materials for the terminal cover.

38. Starting in its January 2011 production run, Gree China made the above requested changes for GE dehumidifiers.

39. Gree China did not make the GE mandated design changes for dehumidifiers manufactured under other brand names, including the dehumidifiers that it was manufacturing and selling to Gree USA and MJC.

40. Gree China did not make the GE mandated design changes despite actual knowledge that the design and materials defects identified by GE were causing Gree China's dehumidifiers to fail, overheat, and catch on fire.

41. Since January of 2011, Gree China manufactured and sold approximately 1,400,000 dehumidifiers to Gree USA and MJC in California that Gree China knew were defective because they did not incorporate the GE mandated design and materials changes.

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

Confidential

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

**GREE CHINA'S AND GREE HONG KONG'S ATTEMPT TO SUPPRESS AND DELAY REPORTING THE DANGEROUS PRODUCT DEFECTS TO THE CONSUMER PRODUCT SAFETY COMMISSION**

42.     In July of 2012, after receiving an unusually high number of consumer complaints, after having witnessed a YouTube video showing a SoleusAir by Gree dehumidifier in flames, and after being contacted by the United States Consumer Product Safety Commission ("CPSC") to respond to a consumer complaint of a dehumidifier that overheated and emitted smoke, MJC became concerned that the Gree China manufactured dehumidifiers were fire safety hazards.

43.     In response to these concerns, Charlie and Jimmie Loh, hereinafter collectively referred to as "Loh", the owners of MJC and officers and directors of Gree USA contacted Gree China to express their concerns and to request technical and engineering assistance.

44.     From July of 2012 until September 2012, Gree China and Gree Hong Kong responded to the concerns expressed by the Lohs by stating that the product was not defective and was not causing fires despite Gree China's actual knowledge of the falsified UL certification and the GE mandated design changes.

45.     In September of 2012, employees of Gree China and Gree Hong Kong, at the direction of Madam Dong, traveled to California to meet with the Lohs and other employees of MJC and Gree USA for the purposes of discussing the dehumidifier safety issues.

46.     During the September 2012 meeting, Larry Lam, an employee of Gree Hong Kong, and an engineer known as Ju from Gree China, informed the Lohs that Gree China and Gree Hong Kong were aware that the plastics used in constructing the dehumidifiers were not compliant with UL 94 and UL 474.

47.     In this meeting, Larry Lam and engineer Ju admitted that Gree China knowingly submitted test sample dehumidifiers to UL which did not comply with UL 94 and UL 474 because Gree China knew that UL relied on manufacturers to test

7

Confidential

1  their products for UL 94 burn rate compliance and that UL would not conduct

2  independent burn rate testing on Gree China's dehumidifiers.

3       48.    At the conclusion of the meeting, Gree China, Gree USA, MJC and

4  Gree Hong Kong agreed not to recall their defective products, or to report the

5  defective design and defective materials issues to the CPSC, its retail customers or

6  the general public to avoid adverse publicity and loss of sales.

7       49.    The decision not to recall their defective products was based on the

8  instructions given from Gree China and Gree Hong Kong to Gree USA and MJC.

9       50.    As part of this decision, Gree China and Gree Hong Kong wanted to

10 delay any recall until 2013 so that Gree China could continue to capture market

11 share and sales and so that Gree China had time to change its manufacturing lines

12 and supply chains to incorporate the design changes and then to use fire resistant

13 materials.

14      51.    From September of 2012 until November/December of 2012, Gree

15 USA and MJC continued to receive consumer complaints of overheating and fires

16 caused by their dehumidifiers.

17      52.    In response to the growing concerns over product safety, Gree USA and

18 MJC placed a temporary hold on sales of dehumidifiers to retailers and warehoused

19 thousands of dehumidifiers.

20      53.    In December of 2012 or January of 2013, after Gree China and Gree

21 Hong Kong insisted and pressured MJC and its officers and directors, Gree USA,

22 MJC and Gree USA released the temporary hold on sales of dehumidifiers to the

23 retailers.

24      54.    As part of MJC and Gree USA's agreement with Gree China and Gree

25 Hong Kong to release the temporary hold, Gree China agreed to defend and

26 indemnify MJC for any losses.

27      55.    Gree China, Gree Hong Kong, Gree USA and MJC continued to sell

28 their defective and unreasonably dangerous dehumidifiers until September of 2013,

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

8

COMPLAINT; JURY TRIAL DEMANDED

Confidential

when the dehumidifiers were recalled pursuant to a voluntary recall program with the CPSC.

## THE RECALL AND CIVIL PENALTY IMPOSED BY THE CPSC

56.   On September 12, 2013, the CPSC announced that Gree China manufactured dehumidifiers were being recalled because of serious fire and burn hazards.

57.   The September 12, 2013 CPSC notice announced that Gree China, Gree Hong Kong, Gree USA and MJC were recalling 2,200,000 dehumidifiers sold from January 2005 through August of 2013 involving the following brand names: Danby, DeLouhgi, Fedders, Fellini, Frigidaire, Gree, Kenmore, Norpole, Premiere, Seabreeze, SoleusAir, and SuperClima.

58.   In January of 2014, the recall was expanded to include 300,000 GE brand dehumidifiers that had been manufactured by Gree China and sold by Gree China to GE between January of 2008 and December of 2010.

59.   The recall was re-announced on May 15, 2014, due to a significant increase in the number of overheating events and fires caused by the dehumidifiers.

60.   In the months between September of 2013 and May of 2014, the number of overheating dehumidifiers increased from 171 to 471.

61.   In the months between September of 2013 and May of 2014, the number of fires almost tripled from 46 to 121.

62.   As of May of 2015, only 240,000 dehumidifiers have been returned by customers and approximately 2,260,000 remained in US residences.

63.   In response to information provided to the CPSC, the CPSC instituted a civil penalty investigation against Gree China, Gree Hong Kong and Gree USA.

64.   The civil penalty investigation alleged that the defendants a) knowingly failed to report a defect and unreasonable risk of serious injury to the CPSC; b) knowingly made misrepresentations to CPSC staff during its investigation; and c)

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

Confidential

knowingly sold dehumidifiers bearing the UL safety certification mark knowing that the dehumidifiers did not meet UL flammability standards.

65.    On or about March 14, 2016, Gree China, Gree Hong Kong and Gree USA entered a Settlement Agreement with the CPSC ("CPCS/Gree Settlement Agreement").

66.    Pursuant to the CPSC/Gree Settlement Agreement, Gree China, Gree Hong Kong and Gree USA admitted that they knew that the dehumidifiers were not complaint with the UL flammability standards and sold, offered to sell, distributed in commerce and imported the dehumidifiers bearing the UL registered safety certification mark the despite knowing that said dehumidifiers were not compliant with UL standards and was not authorized by UL in violation of section 19(a)(12) of the CPSA, 15 U.S.C. § 2068 (a)(12).

67.    On March 25, 2016, the CPSC announced that the defendants had agreed to pay a civil penalty of $15,450,000.00 to settle the charges alleged by the CPSC.

68.    This civil penalty is a record settlement, with the defendants being the first alleged violators of CPSC rules to reach the per violation maximum imposed by the Consumer Product Safety Improvement Act of 2008.

## THE CRIMINAL PROSECUTION AND ADMISSIONS MADE BY GREE CHINA AND GREE HONG KONG

69.    On October 21, 2021, Gree China and Gree Hong Kong entered into a delayed prosecution agreement with the United States with respect to their acts and omissions with regard to their sale and distribution of dehumidifiers.  As part of the resolution of the criminal charges filed by the United States against Gree China and Gree Hong Kong, it was agreed that Gree Electric Appliances, Inc. of Zhuhai ("Gree Zhuhai"), Gree USA, Inc. ("Gree USA"), and Hong Kong Gree Electric Appliances Sales Co., Ltd. ("Gree Hong Kong") (collectively the "Gree Companies") hereby agree and stipulate that the following information is true and accurate. The Gree

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

10
COMPLAINT; JURY TRIAL DEMANDED

Confidential

Companies admit, accept, and acknowledge that they are responsible for the acts of their officers, directors, employees, and agents as set forth below.  The Gree Companies also admit, accept, and acknowledge that, had this matter proceeded to trial, the government would have proven beyond a reasonable doubt, by admissible evidence, the facts set forth below:

## THE GREE COMPANIES

A.  From 2007 to September 2013, Gree Zhuhai was a large Chinese company that manufactured household appliances ("Gree appliances") for sale in and outside of China, including in the United States.

B.  From 2007 to September 2013, Gree Hong Kong was a Chinese subsidiary of Gree Zhuhai that exported Gree appliances to the United States.

C.  From 2010 to September 2013, Gree USA was a California corporation with offices in City of Industry, California, and a subsidiary of Gree Hong Kong. Gree USA sold Gree appliances to retailers in the United States. Those Gree appliances were manufactured by Gree Zhuhai and imported into the United States by Gree Hong Kong and Gree USA. Gree USA was a joint venture between Gree Hong Kong and another company, MJC America Holdings Co., Inc. ("MJC America Holdings"). Gree Hong Kong was the majority owner of Gree USA. Gree USA's Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), who was the brother of Gree USA's CEO, and Chief Administrative Officer ("CAO") were owners of MJC America Holdings. Gree USA's CEO, CFO and CAO effectively controlled Gree USA.

D.  From 2010 to September 2013, Gree USA sold in the United States dehumidifiers manufactured by Gree Zhuhai and imported into the United States by Gree Hong Kong ("Gree dehumidifiers").

## THE CONSUMER PRODUCT SAFETY COMMISSION AND THE CONSUMER PRODUCT SAFETY ACT

E.  The Consumer Product Safety Act (the "CPSA") was enacted to protect the public from dangerous consumer products.

F.  The United States Consumer Product Safety Commission (the "CPSC") is the federal agency responsible for protecting consumers from dangerous consumer products and is the lead federal agency responsible for the implementation, enforcement, and administration of the CPSA. The CPSC can order mandatory recalls of dangerous products.

G.  The CPSA requires companies that manufacture, import, distribute, or sell consumer products to inform the CPSC, among other things, about any consumer product about which information reasonably supports the conclusion that such product contains a defect that could create a substantial product hazard, or creates an unreasonable risk of serious

11

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

Confidential

injury or death. This duty to report also applies to the individual directors, officers, and agents of those companies. A company's or an individual's knowing and willful failure to report an unsafe product to the CPSC is punishable as a felony violation of the CPSA.

## THE GREE COMPANIES LEARN THAT THEIR DEHUMIDIFIERS ARE CATCHING FIRE

H.   On or about July 26, 2012, the CEO of Gree USA saw a video of a burning Gree dehumidifier. On July 26, 2012, Gree USA's CEO sent the video to a Gree Hong Kong manager ("Gree Hong Kong Manager #1"), who was also a director of Gree Hong Kong and in charge of exporting Gree appliances for sale in the United States, copying other Gree USA employees and a Gree Zhuhai employee. In sending the video, Gree USA's CEO labeled the email "urgent," and said that the video was "scarey [sic] to just watch" and a "very serious issue with GREE product quality." Gree USA's CEO also stated that the video was the third reported instance of a Gree appliance catching fire since in or about June 2012 and that it could lead to lawsuits against Gree USA as well as a recall costing millions of dollars. Gree USA's CEO knew that the Gree Companies had an obligation to inform the CPSC immediately of any consumer product that contained a defect creating a substantial product hazard or that created an unreasonable risk of serious injury or death.

I.   Gree Hong Kong Manager #1, replied to the July 26, 2012 email from Gree USA's CEO that same day. In his reply email, Gree Hong Kong Manager #1 said that "[w]e also felt shock when we watched the video[,]" and that he had sent the video to Gree Zhuhai's Quality Department and to Gree Zhuhai's chief engineer who was also its senior vice president for research and development.

## THE GREE COMPANIES LEARN THAT TWO DEFECTS IN THEIR DEHUMIDIFIERS ARE CAUSING THEM TO CATCH FIRE

J.   During August 2012, Gree USA and Gree Zhuhai employees, engineers and officers investigated the Gree dehumidifiers for potential defects that could cause them to catch fire. No employee of Gree USA or Gree Zhuhai informed the CPSC of a defect or risk associated with the Gree dehumidifiers in August 2012.

K.   On September 4, 2012, Gree USA's CEO emailed Gree Hong Kong Manager #1 about the Gree dehumidifiers. The CEO stated that Gree USA had tested its dehumidifier inventory in Gree USA's warehouse and the testing showed that these dehumidifiers burned. The CEO stated "the result is not like what you have told us" regarding how many units were involved because "the result shows the units all can catch the fire and apparently the material is not according to UL standard! I don't think the factory is telling us the fact and truth. . . ." The CEO stated that, because of Gree USA's test results, he would have the dehumidifiers further tested for compliance with UL (formerly Underwriters Laboratory) standards and was planning to inform the CPSC about the Gree dehumidifiers.

L.   On September 5, 2012, Gree Hong Kong Manager #1 emailed Gree

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

COMPLAINT; JURY TRIAL DEMANDED

Confidential

USA's CEO instructing "Gree USA to resolve the claim and CPSC case" and stating that Gree Zhuhai would "fully indemnify Gree USA for any expense and responsibility." That same day, Gree USA's CEO replied and requested more details regarding who would pay the costs that could result from the Gree dehumidifiers and when they would pay, and offered to handle reporting the Gree dehumidifiers to the CPSC if Gree Zhuhai would agree to pay all future costs related to the dehumidifiers' defects. Gree Hong Kong Manager #1 replied on September 6, 2012, stating that they were willing to agree to compensate expenses in a timely manner and that Gree USA "would be the single entity to reply insurance company and CPSC, [and] we will provide the necessary supports of test records and technical information if you need any." After these communications, no one from the Gree Companies informed the CPSC about the Gree dehumidifiers or their defects.

M.    On September 10, 2012, Gree USA's CEO emailed the highest ranking person at Gree Zhuhai, the chairperson of Gree Zhuhai's board who also served as Gree Zhuhai's President and CEO, copying no one else from Gree Zhuhai or Gree Hong Kong. In this email, Gree USA's CEO stated that "GREE headquarters" had told him not to report the Gree dehumidifiers to the CPSC. Specifically, the Gree USA CEO stated that "GREE headquarters" had told him not to report that the Gree dehumidifiers may be defective and catch on fire and that they might have overheating parts and plastic parts that could burn because the plastic did not meet the UL standard for fire resistance. Gree USA's CEO warned in his email that any company or individual who withheld from the CPSC information about a dangerous product could face severe punishment, including criminal prosecution. Gree USA's CEO asked how Gree Zhuhai would pay future costs related to the Gree dehumidifiers, including any potential harm to MJC America Ltd. ("MJC America"), a company owned by Gree USA's CEO, CFO and CAO which also sold the defective Gree dehumidifiers. Gree USA's CEO stated that if Gree Zhuhai did not give him clear instructions on how to handle the Gree dehumidifiers within a matter of days, then he would inform the CPSC about the dehumidifiers. No one replied to this email.

N.    On September 13, 2012, Gree USA's CEO sent another email to Gree Hong Kong Manager #1. In this email, Gree USA's CEO discussed how a recall of the defective Gree dehumidifiers might be handled and attached the CPSC's "Recall Handbook." Gree USA's CEO also discussed the financial costs and lost sales that could result from a recall. He did not express any consideration or concern about how defective Gree dehumidifiers could harm consumers. Gree USA's CEO asked Gree Hong Kong Manager #1 to forward this email to Gree Zhuhai's chief engineer.

O.    On September 19, 2012, Gree Hong Kong Manager #1 came to Gree USA's offices in City of Industry, California, to meet with Gree USA's CEO. A Gree Zhuhai engineer and three other Gree USA officers also participated in the meeting. This meeting was audio recorded by agreement.

P.    At this September 19 meeting, Gree Hong Kong Manager #1 stated that Gree Zhuhai's testing of the Gree dehumidifiers was not able to reproduce the reported fire, but had revealed two defects: (1) the dehumidifiers used plastics that did not meet UL standards for fire resistance; and (2) electrical arcing caused by the dehumidifiers' compressors overheating could burn the non-UL standard plastic used

13

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

Confidential

in these dehumidifiers. The Gree Zhuhai engineer at the meeting also discussed these defects. Gree Hong Kong Manager #1 stated that he was aware of at least five consumer reports of Gree dehumidifiers overheating and catching fire but that Gree Zhuhai "still believe[d] that the fire case is a relatively isolated case . . . associated with atrocious conditions." He also stated that Gree Zhuhai would modify the manufacture of all future dehumidifiers to fix this problem so they would not catch fire.

## THE GREE COMPANIES DECIDE TO DELAY REPORTING AND RECALLING THEIR DEFECTIVE DEHUMIDIFIERS

Q.   At this same September 19 meeting, Gree Hong Kong Manager #1 said that the meeting participants' decisions on what to do about the Gree dehumidifiers should be guided by the principle of minimizing the costs and loss of reputation to the Gree Companies. Gree Hong Kong Manager #1 said that Gree Zhuhai wanted to delay any recall of the dehumidifiers for 6 to 9 months because delaying a recall would reduce the recall's effect on Gree dehumidifier sales. Gree Hong Kong Manager #1 stated that an immediate recall would have a significant, and negative, effect on 2012 and 2013 Gree dehumidifier sales. Gree Hong Kong Manager #1 stated that a recall could be delayed 6 to 9 months because cooler fall and winter temperatures would help prevent Gree dehumidifiers from overheating and catching fire, and that there should be very few, if any, dehumidifier fires in the 6 to 9 months following September 2012.

R.   In response to what Gree Hong Kong Manager #1 said, Gree USA's CEO said at the meeting that the Gree dehumidifiers' defects were very significant and had important legal implications. But the Gree USA CEO did not push to inform the CPSC of the dehumidifiers. Rather, Gree USA's CEO recommended only that the Gree Companies have another company test the Gree dehumidifiers and then decide whether to delay the recall. Gree Hong Kong Manager #1 responded by urging the Gree USA officers not to conduct such a test of the Gree dehumidifiers because that test would show that the dehumidifiers used plastic that did not meet UL standards for fire resistance. Gree USA's CEO said that the Gree USA officers understood what Gree Zhuhai was asking them to do and needed time to think before making a decision about how to proceed.

S.   Two days after the September 19, 2012 meeting, Gree USA's CEO sent an email to Gree Zhuhai's chief engineer and copied the email to Gree Zhuhai's board chairperson. In his September 21, 2012 email, Gree USA's CEO said that he understood that Gree Zhuhai wanted to delay a recall of the Gree dehumidifiers for 6 to 9 months. Gree USA's CEO also said that he thought that the Gree dehumidifiers were still likely to catch fire, and that, after careful consideration, Gree USA's officers had decided to report the Gree dehumidifiers to the United States government.

T.   The next day, Gree Zhuhai's chief engineer replied to the September 21, 2012 email from Gree USA's CEO without copying Gree Zhuhai's board chairperson. In his September 22, 2012 email, Gree Zhuhai's chief engineer said that Gree Zhuhai had clearly expressed its opinion about how to handle the defective Gree dehumidifiers, and that he hoped Gree USA's CEO would follow that opinion. Gree Zhuhai's

COMPLAINT; JURY TRIAL DEMANDED

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

Confidential

chief engineer said that he had no authority to approve what Gree USA's CEO proposed in his September 21, 2012 email and that he hoped Gree USA's CEO would report his decision on how to handle the defective Gree dehumidifiers to Gree Zhuhai's board chairperson and listen to her opinion.

U.   On September 28, 2012, Gree USA's CEO sent an email to Gree Zhuhai's board chairperson, copying no one else from Gree Zhuhai or Gree Hong Kong. In his email, Gree USA's CEO stated again that Gree's dehumidifiers had two known defects: (1) the compressors in the dehumidifiers could overheat; and (2) the plastic in the dehumidifiers did not meet UL standards for fire resistance, meaning that the plastic would burn when overheated. Gree USA's CEO said that it was known that these two defects could cause the dehumidifiers to catch fire and that there were numerous consumer complaints about the dehumidifiers in fact catching fire. Gree USA's CEO also said that the Gree Companies had sold millions of these defective dehumidifiers. Gree USA's CEO further related that he believed the Gree Companies should recall the dehumidifiers and warn consumers that using them could result in personal injuries and property damage, but that Gree Zhuhai had not agreed to a recall. Gree USA's CEO warned that a recall could cost hundreds of millions of dollars, would harm the reputation of Gree products, and would reduce the Gree Companies' market share. But Gree USA's CEO also warned that if Gree Zhuhai did not reach an agreement with Gree USA on the recall of the dehumidifiers, then Gree USA unilaterally would report the Gree dehumidifiers to the United States government. Gree USA's CEO concluded his email by saying that this was a very important and urgent matter. Neither Gree Zhuhai's board chairperson nor anyone else at Gree Zhuhai replied to this email.

V.   Despite the Gree USA's CEO's September 4, 10, 21, and 28, 2012 emails, no employee of the Gree Companies reported the Gree dehumidifiers' defects or risks, or the known consumer complaints of fires related to the dehumidifiers, to the CPSC in September 2012.

W.   In September 2012, Gree USA sold at least 24,999 defective Gree dehumidifiers to retailers in the United States for approximately $2,558,019. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

**THE GREE COMPANIES CONTINUE TO SELL THEIR DEFECTIVE DEHUMIDIFIERS IN THE UNITED STATES WITHOUT REPORTING THEM TO THE CPSC**

X.   On October 19, 2012, a sales representative for Gree USA met in person with Gree Zhuhai's board chairperson in China. During this meeting, the sales representative discussed the defective Gree dehumidifiers with Gree Zhuhai's board chairperson. Gree Zhuhai's board chairperson said that she would send a new Gree Hong Kong manager ("Gree Hong Kong Manager #2") to the United States to address the problems associated with the dehumidifiers.

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

15

COMPLAINT; JURY TRIAL DEMANDED

Confidential

Y.     In October 2012, Gree USA sent to Gree Zhuhai new consumer reports of fires related to the Gree dehumidifiers. These reports contradicted Gree Hong Kong Manager #1's statements at the September 19 meeting that a recall could be delayed 6 to 9 months because cooler fall and winter temperatures would help prevent dehumidifiers from overheating and catching fire and that there should be very few, if any, dehumidifier fires in the 6 to 9 months following September 2012. Despite these new consumer reports of fires caused by Gree dehumidifiers, no employee of the Gree Companies informed the CPSC about the dehumidifiers' defects or risks in October 2012.

Z.     In October 2012, Gree USA sold at least 2,938 defective Gree dehumidifiers to retailers in the United States for approximately $429,426. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

## THE GREE COMPANIES RECEIVE ANOTHER TEST REPORT SHOWING THAT THEIR DEHUMIDIFIERS ARE DEFECTIVE AND DANGEROUS

AA.    In late October 2012, Gree USA sent two Gree dehumidifiers to an independent testing company for testing. On November 5, 2012, the testing company wrote a report confirming and reiterating that the Gree dehumidifiers were defective because the compressors in the dehumidifiers could run continuously and thereby overheat to an "extreme high temperature." Gree USA's CEO received this report on November 6, 2012. Gree USA's CEO immediately sent the report to Gree Hong Kong Manager #2, who had taken over responsibility for the importation and sale of the Gree dehumidifiers in the United States from Gree Hong Kong Manager #1.

## THE GREE COMPANIES CONTINUE TO SELL THEIR DEFECTIVE DEHUMIDIFIERS IN THE UNITED STATES WITHOUT REPORTING THEM TO THE CPSC

BB.    At the end of November 2012, Gree USA's CEO told Gree Hong Kong Manager #2 that an attorney advised him to inform the CPSC immediately of all consumer reports of fires related to the Gree dehumidifiers. Despite this legal advice and the November 5, 2012 test report reiterating that the Gree dehumidifiers were dangerously defective, no employee of the Gree Companies informed the CPSC about the dehumidifiers' defects, risks, or reported fires in November 2012.

CC.    In November 2012, Gree USA sold at least 6,817 defective Gree dehumidifiers to retailers in the United States for approximately $792,067. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

16

Confidential

USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

## THE GREE COMPANIES HAVE YET ANOTHER MEETING TO DISCUSS THEIR DEFECTIVE DEHUMIDIFIERS BUT STILL DO NOT INFORM THE CPSC

DD.   On December 18, 2012, Gree USA's CEO and another Gree USA officer went with an attorney to Hong Kong to meet with Gree Hong Kong Manager #2, a Gree Zhuhai engineer, Gree Zhuhai's Chief Financial Officer ("CFO") and three attorneys representing Gree Zhuhai. At this meeting, Gree USA's CEO discussed the November 5, 2012 test report with Gree Hong Kong Manager #2, the Gree Zhuhai engineer and the Gree Zhuhai CFO. Gree Hong Kong Manager #2, the Gree Zhuhai engineer and the Gree Zhuhai CFO told Gree USA's CEO that Gree Zhuhai would test the Gree dehumidifiers and let him know the results of their testing.

EE.   No employee of the Gree Companies informed the CPSC about the dehumidifiers' defects, risks, or reported fires in December 2012.

FF.   In December 2012, Gree USA sold at least 1,395 defective Gree dehumidifiers to retailers in the United States for approximately $201,835. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

## THE GREE COMPANIES DECIDE TO KEEP SELLING THEIR DEFECTIVE DEHUMIDIFIERS IN THE UNITED STATES WITHOUT REPORTING THEM TO THE CPSC

GG.   On January 23, 2013, a Gree USA officer sent an email to Gree Hong Kong Manager #2. The email stated that Gree USA's and MJC America's insurance company suggested that Gree USA report the Gree dehumidifiers to the CPSC and recall all of the defective Gree dehumidifiers. The email also stated that the insurance company "wanted to know if any actions were taken to test the product design in case it is defective" and was told that "the product was submitted to several different testing and no faulty [sic] in the design was found[,] also that new production has an extra protection[.]" The Gree USA officer further reported in her email that Gree USA had received a new consumer report of a dehumidifier fire and asked how Gree USA should handle this report.

HH.   Also on January 23, 2013, Gree Zhuhai told Gree USA in writing that it had tested its dehumidifiers and that they were not defective and could be sold in the United States. Gree Zhuhai did not provide Gree USA with any details on its testing or explain the inconsistency in its test results with those of all prior tests of the Gree dehumidifiers.

II.   Despite the recommendation of Gree USA's insurance company to

17

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

Confidential

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

report the Gree dehumidifiers to the CPSC and recall the defective Gree dehumidifiers, and the new consumer report of fire, no employee of the Gree Companies informed the CPSC about the dehumidifiers' defects, risks, or reported fires in January or February 2013.

JJ.    Gree USA sold at least 7,609 and 29,857 defective Gree dehumidifiers in January and February 2013, respectively, to retailers in the United States for approximately $905,291, and $3,255,542, respectively. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

## THE GREE COMPANIES FINALLY REPORT THEIR DEFECTIVE DEHUMIDIFIERS TO THE CPSC BUT CONTINUE TO SELL THOSE DEHUMIDIFIERS IN THE UNITED STATES

KK.    On March 14, 2013, Gree USA, Gree Zhuhai, and MJC America made an initial report to the CPSC about their dehumidifiers. The initial report stated that they had sold approximately 1.6 million Gree dehumidifiers in the United States since 2010, and that consumers who had purchased those dehumidifiers had reported fires, overheating, smoke, odors, and property damage related to these dehumidifiers. The initial report did not mention the defects in the Gree dehumidifiers that caused the dehumidifiers to burn.

LL.    Gree USA sold at least 6,025 and 7,596 defective Gree dehumidifiers in March and April 2013, respectively, to retailers in the United States for approximately $571,702 and $799,244, respectively. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

MM.    On April 23, 2013, the Chief Administrative Officer of Gree USA received an independent test report showing that the plastic used in four Gree dehumidifiers made in 2010, 2011, and 2012 did not meet UL standards for fire resistance.

NN.    On April 30, 2013, Gree USA, Gree Zhuhai, and MJC America made a second, more comprehensive report to the CPSC about their defective Gree dehumidifiers. This report stated that Gree USA, Gree Zhuhai, and MJC America sold approximately 1.84 million of the Gree dehumidifiers and that they had not concluded that these Gree dehumidifiers posed a substantial product hazard or that the dehumidifiers needed to be recalled. This report listed nineteen known consumer reports of fires involving Gree dehumidifiers with all but one of the fires occurring between June 14, 2012 and April 15, 2013.

OO.    After their April 30, 2013 report to the CPSC, the Gree Companies continued to receive consumer reports of fires caused by Gree dehumidifiers.

PP.    The Gree Companies received at least $9,500,000 from the distribution and wholesale of defective Gree dehumidifiers from September 2012

18

Confidential

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

through April 2013. Additionally, the Gree Companies received at least $29,500,000 from the distribution and wholesale of other non-defective Gree dehumidifiers from September 2012 through April 2013.

QQ.   United States consumers lost at least $17,400,000 by purchasing defective and dangerous Gree dehumidifiers manufactured, distributed, or sold by the Gree Companies from September 2012 through April 2013.

RR.   From September 2012 to April 2013, United States consumers sustained at least $2,100,000 worth of property damaged or destroyed in fires caused by the defective Gree dehumidifiers.

## THE GREE COMPANIES IMPORTED THEIR DEFECTIVE DEHUMIDIFIERS WITH FALSE UL CERTIFICATIONS

SS.   Between 2010 and at least until September 2012, the Gree Companies imported into the United States Gree dehumidifiers with certifications that the dehumidifiers met all UL standards, when in fact the dehumidifiers did not meet UL standards.

## THE GREE COMPANIES FINALLY RECALL THEIR DEFECTIVE DEHUMIDIFIERS

TT.   By mid-July 2013, Gree Zhuhai decided to recall its defective Gree dehumidifiers and notified the CPSC of this decision. After making this decision, Gree Zhuhai started to plan for the recall.

UU.   On September 12, 2013, Gree Zhuhai and the CPSC announced a voluntary recall of 2.2 million Gree dehumidifiers in the United States.

VV.   Despite its recall, Gree Zhuhai has received hundreds of consumer reports of fires and overheating caused by defective Gree dehumidifiers. Consumers have reported more than 2,000 incidents involving Gree dehumidifiers, including 450 fires and more than $19,000,000 in property damage.

WW.   No later than September 19, 2012, each of the Gree Companies had information which reasonably supported the conclusion that their Gree dehumidifiers: (1) contained defects which created a substantial product hazard, that is, a substantial risk of injury to the public; and (2) created an unreasonable risk of serious injury or death. After learning this information, each of the Gree Companies knowingly and willfully failed immediately to inform the United States Consumer Product Safety Commission about these dangerous defects in their Gree dehumidifiers or the dangerous risks posed by their Gree dehumidifiers.

## COUNT I – NEGLIGENCE CONDUCT

70.   Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

71.   The defendants owed a duty to plaintiff's insured to design, manufacture, produce, test, inspect, market, distribute and sell dehumidifiers with

19

Confidential

reasonable care, and had a duty to protect plaintiffs from foreseeable and unreasonable risk of harm.

72.     The defendants breached this duty by, among other things, negligently designing, manufacturing, testing, inspecting and distributing the defective dehumidifiers.

73.     As is set forth more fully above, the defendants knew or should have known that the dehumidifiers they designed, manufactured, produced, tested, inspected, marketed, distributed and sold, in ordinary and foreseeable use, created unreasonable safety risks and would fail to perform as intended, resulting in fires and related property damage.

74.     The defendants knew or should have known that the dehumidifiers created dangerous and unreasonable safety risks as the dehumidifiers had defects which caused them to overheat, smoke, catch fire and ignite other combustible materials in homes and businesses.

75.     The defendants knew or should have known that the dehumidifiers had defects that could cause catastrophic property damage, personal injury and/or death.

76.     Based on this knowledge, the defendants had a duty to disclose to the plaintiffs the serious safety risks created by their dehumidifiers, and a duty to disclose the defective nature of their dehumidifiers.

77.     The defendants had a further duty not to put the defective dehumidifiers on the market and a continued duty to replace their unsafe dehumidifiers, remove their unsafe dehumidifiers from the market and recall their unsafe dehumidifiers from customers.

78.     The defendants failed to exercise reasonable care with respect to the design, manufacture, production, testing, inspection, marketing, distribution and sale of their dehumidifiers, by, among other things, failing to design and manufacture the dehumidifiers in compliance with UL requirements; failing to design and manufacture the dehumidifiers in a manner to ensure that under normal intended

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

20

Confidential

usage the dehumidifiers would not fail and catch fire; and, by failing to undertake a reasonable recall of the dehumidifiers.

79.   The defendants failed to exercise reasonable care in that they failed to adequately and sufficiently warn consumers and users, either directly or indirectly, of the uniform defects in the dehumidifiers.

80.   The defendants failed to exercise reasonable care when they knew of the safety risks posed by the dehumidifiers and actively concealed those risks from plaintiffs' insureds UL, major US retailers where the dehumidifiers were ultimately sold, as well as the general public.

81.   As a direct and proximate result of the negligent acts and omissions set forth above, plaintiffs' insureds purchased the dehumidifiers without the knowledge of these defects or their serious safety risks.

82.   In addition to their negligent conduct, the defendants also acted with malice, partaking in despicable conduct, consciously disregarding the safety of plaintiffs' insureds by designing, manufacturing and selling the dehumidifiers when the defendants knew that the dehumidifiers posed an extreme risk of fire and the consequent risk to life and property.

83.   This despicable conduct includes but is not limited to:

A.   Knowingly and with a conscious disregard for fire safety manufacturing, selling and distributing the dehumidifiers without the UL required flame retardant plastics;

B.   Knowingly and with a conscious disregard for fire safety manufacturing, selling and distributing the dehumidifiers after intentionally misrepresenting to UL, US retailers and US consumers that the dehumidifiers complied with UL;

C.   Knowingly and with a conscious disregard for fire safety manufacturing, selling and distributing the dehumidifiers without the fire safety design changes mandated by GE in 2010;

D.   Knowingly and with a conscious disregard for fire safety manufacturing, selling and distributing the dehumidifiers with design defects that they knew would cause fires;

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

COMPLAINT; JURY TRIAL DEMANDED

Confidential

E.  Knowingly and with a conscious disregard for fire safety, failing to report fires to the CPSC so as to continue to sell the dehumidifiers after they had actual knowledge that the dehumidifiers were causing fires;

F.  Knowingly and with a conscious disregard for fire safety failing to recall the dehumidifiers so that they could continue to sell the dehumidifiers with the fire safety design defects

84.   The defendants' despicable actions done in conscious disregard of fire hazards to life and property proximately caused the fires and property damages set forth above.

## COUNT II – STRICT PRODUCT LIABILITY

85.   Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

86.   Defendants are engaged in the business of designing, manufacturing, distributing, advertising, marketing, promoting and/or selling appliances, including dehumidifiers, throughout the United States.

87.   Defendants designed, manufactured, distributed, advertised, marketed, promoted and sold the dehumidifiers at issue herein.

88.   The dehumidifiers were expected to, and did, reach plaintiffs' insureds without substantial change in the condition in which the dehumidifiers were manufactured, sold and distributed.

89.   The dehumidifiers were in a defective and unreasonably dangerous condition when they left defendants' possession or control in that, under normal conditions, usage and applications, the dehumidifiers could not withstand the use for which they were intended and instead failed, causing fire, smoke and related damages as well as threatening the consumers' personal safety.

90.   Plaintiff's insureds used the dehumidifiers in a manner reasonably intended by defendants.

91.   The dehumidifiers were defective for the following reasons: (1) they were not reasonably safe for the ordinary and intended use of dehumidifying the environment; (2) defendants failed to provide plaintiffs' insureds with adequate and

COMPLAINT; JURY TRIAL DEMANDED

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

Confidential

sufficient warnings regarding the known and foreseeable safety risks and dangers inherent in the dehumidifiers; (3) the design, methods of manufacture and testing of the dehumidifiers were inadequate and produced a defective product.

92.     As a direct and proximate result of the defective condition of the defendants' dehumidifiers, plaintiffs' insureds purchased dehumidifiers that did not serve the purpose for which they are intended, causing property damages and other incidental and consequential damages to plaintiffs' insureds and creating risks of future harm to purchasers of these defective dehumidifiers.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for the following judgment:

1.     For damages in excess of $90,000, plus prejudgment interest thereon at the legal rate from the date of loss;

2.     For costs of suit incurred herein; and

3.     For such other and further relief as the Court deems just and proper.

Dated: May 10, 2022                    COZEN O'CONNOR

By: _____
          Megan Peitzke, Esq.
Attorneys for Plaintiff
FARMERS INSURANCE EXCHANGE

COMPLAINT; JURY TRIAL DEMANDED

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

Confidential

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all claims for which a jury trial is authorized.

Dated: May 10, 2022                    COZEN O'CONNOR

By: _____
     Megan Peitzke, Esq.
Attorneys for Plaintiff
FARMERS INSURANCE EXCHANGE

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

24
COMPLAINT; JURY TRIAL DEMANDED

Confidential